# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| SALLY PEMBERTON, derivatively and on behalf of PATTERSON COMPANIES, INC., | **Case No. 0:18-cv-2818** |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| SCOTT P. ANDERSON, ANN B. GUGINO, MARK S. WALCHIRK, JOHN D. BUCK, ALEX N. BLANCO, JODY H. FERAGEN, SARENA S. LIN, ELLEN A. RUDNICK, NEAL A. SCHRIMSHER, LES C. VINNEY, JAMES W. WILTZ, PAUL GUGGENHEIM, DAVID MISIAK, and TIM ROGAN, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| PATTERSON COMPANIES, INC., | |
| Nominal Defendant. | |

Plaintiff Sally Pemberton ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Patterson Companies, Inc. ("Patterson" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Scott P. Anderson, Ann B. Gugino, Mark S. Walchirk, John D. Buck, Alex N. Blanco, Jody H. Feragen, Sarena S. Lin, Ellen A. Rudnick, Neal A. Schrimsher, Les C. Vinney, James W. Wiltz, Paul Guggenheim, David Misiak, and Tim Rogan

– 1 –

(collectively, the "Individual Defendants," and together with Patterson, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Patterson, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for her complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Patterson, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Patterson's directors and officers.

2.      Patterson operates through two strategic business units: Patterson Dental and Patterson Animal Health. Patterson Dental is a full-service, national distributor that sells dental supplies, equipment, and services to dental practitioners throughout the

United States. It is the second largest distributor of dental supplies and equipment in the United States.

3.      Patterson, along with competitors Benco Dental Supply Co. ("Benco") and Henry Schein, Inc. ("Schein" or "Henry Schein"), collectively control about 85% of the sale of all dental products and services made through distributors in the United States.

4.      In recent years, independent dentists have adopted a purchasing strategy used in the medical industry, forming group purchasing organizations ("GPOs" or "buying groups") to combine purchasing power in order to obtain lower prices from distributors.

5.      The Individual Defendants caused the Company, with Benco and Schein, to engage in a conspiracy in restraint of trade, whereby the companies agreed to refuse to offer discounted prices or otherwise negotiate with GPOs, agreed to fix margins on dental supplies and equipment, agreed not to poach one another's customers or sales representatives, and agreed to block the entry and expansion of rival distributors (the "Antitrust Misconduct"). This agreement was made and enforced by senior executives of the Company.

6.      On February 12, 2018, the Federal Trade Commission filed an administrative complaint against Patterson, Benco and Schein. The complaint alleged that starting from at least February 2013, the named entities had engaged in a conspiracy to fix the prices of dental supply products and refused to sell to GPOs, in violation of federal antitrust law.

7.      On this news, the price of Patterson shares fell over 5%, or $1.71 per share, from their closing price on the previous day, closing at $31.21 per share on February 13, 2018.

8.      Before markets opened on March 1, 2018, the Company issued a press release announcing its financial results for its fiscal quarter ended January 27, 2018. The press release revealed, *inter alia*, that adjusted earnings per share decreased 25.9% year-over-year, sales were down in each category in the Company's Dental segment, and the Company was revising its full year guidance downward for the second consecutive quarter. Chief Executive Officer Mark Walchirk was quoted as attributing the disappointing results on transitions in the business, including changes in the sales force. The press release also revealed that, effective that day, Defendant Ann Gugino would be transitioning out of the role of Chief Financial Officer, despite the fact that the Company had not identified a replacement for her.

9.      On this news, the price of Patterson shares fell nearly 24%, or $7.47 per share, from their closing price on the previous day, closing at $24.11 per share on March 1, 2018.

10.     The Individual Defendants breached their fiduciary duties by engaging in the Antitrust Misconduct.

11.     The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls.

- 4 -

12.     In further breach of their fiduciary duties, the Individual Defendants intentionally or recklessly wasted corporate assets on excessive severance payments made to Defendants Scott P. Anderson and Ann B. Gugino.

13.     Moreover, the Individual Defendants breached their fiduciary duties in that they made and/or caused the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, from at least June 26, 2015 through February 28, 2018, inclusive, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) as a result of the Antitrust Misconduct, the Company's revenue and earnings were fraudulently inflated; and (3) the Company failed to maintain internal controls.

14.     As a result of the foregoing, the Individual Defendants' and Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

15.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while five of them

engaged in lucrative insider sales, netting proceeds of about $4.5 million. Approximately

9,380,566 shares of the Company's common stock were repurchased between August 2,

2015 and January 27, 2018 for approximately $412.8 million. As the Company stock was

actually only worth $22.10 per share during that time, the Company overpaid

approximately $205.5 million in total.

16.     The Individual Defendants' breaches of fiduciary duty and other

misconduct have subjected Patterson to a Federal Trade Commission Complaint (the

"FTC Action"), an antitrust action alleging Sherman Act and state antitrust law violations

filed by SourceOne Dental, Inc. pending in the United States District Court for the

Eastern District of New York (the "SourceOne Action"),[1] an antitrust action alleging

Sherman Act, state antitrust law, and state common law violations filed by IQ Dental

Supply, Inc. pending in the United States District Court for the Eastern District of New

York (the "IQ Dental Supply Action"),[2] a class action complaint for violations of the

Sherman Act pending in the United States District Court for the Eastern District of New

York (the "Antitrust Action"),[3] a suit instituted by the State of Texas which was

---

[1] *SourceOne Dental, Inc. v. Patterson Companies, Inc. and Benco Dental Supply Company*, Docket No. 2:15-cv-05440-BMC-GRB (E.D.N.Y.), filed September 9, 2015.

[2] *IQ Dental Supply, Inc. v. Henry Schein, Inc., Patterson Companies, Inc. and Benco Dental Supply Company*, Docket No. 2:17-cv-04834-BMC-GRB (E.D.N.Y.), filed August 17, 2017. This action was dismissed with prejudice for lack of antitrust standing on IQ Dental Supply's antitrust claims, and for failure to state a claim on the remaining state claims. Plaintiff IQ Dental Supply appealed the dismissal, and that appeal is pending at the time of filing this complaint.

[3] *In re Dental Supplies Antitrust Litigation*, Docket No. 1:16-cv-00696-BM C-GRB, (E.D.N.Y.), filed February 2, 2016.

ultimately settled for $200,000 and injunctive relief, and have subjected Patterson, its former Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO"), to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Minnesota (the "Securities Class Action"). The Individual Defendants' breaches of fiduciary duty and other misconduct have resulted in the need for Patterson to undertake internal investigations; losses due to the Company's overpayment of approximately $205.5 million for the repurchases of its own stock and due to Individual Defendants having been improperly over-compensated by the Company, and will cost the Company going forward many millions of dollars.

17.    In the SourceOne Action, District Judge Brian M. Cogan denied defendants Patterson and Benco's motion for summary judgment on April 12, 2018 with respect to all claims other than SourceOne's state law aiding-and-abetting claims. SourceOne Order at 1-2, *SourceOne Dental, Inc. v. Patterson Companies, Inc. and Benco Dental Supply Company*, Docket No. No. 2:15-cv-05440, (E.D.N.Y. Apr. 12, 2018) ("SourceOne Order").

18.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, seven of whom are the Company's current directors, of the substantial likelihood of the directors' liability in this derivative action and of their not being disinterested and/or independent directors, a majority of the Patterson Board of Directors

(the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because the Company is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of Patterson common stock. Plaintiff has continuously held Patterson common stock at all relevant times and resides in Hennepin County, Minnesota.

**Nominal Defendant Patterson**

25.     Nominal Defendant Patterson is a Minnesota corporation with its principal executive offices at 1031 Mendota Heights Road, St. Paul, Minnesota 55120.  Patterson stock trades on the NASDAQ under the ticker symbol "PDCO."

**Defendant Anderson**

26.     Defendant Scott P. Anderson ("Anderson") served as the Company's CEO and President from April 2010 to June 1, 2017, as a Director from June 2010 to September 18, 2017, and as Chairman from April 2013 to June 1, 2017. According to the Company's Schedule 14A filed with the SEC on August 4, 2017 (the "2017 Proxy Statement"), on July 21, 2017, Defendant Anderson beneficially owned 107,548 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Defendant Anderson owned over $4.6 million worth of Patterson stock.

27.     For the fiscal year ended April 29, 2017, Defendant Anderson received $3,123,076 in compensation from the Company. This included $816,693 in salary,

---

[4] Includes 18,130 shares allocated to Defendant Anderson's Employee Stock Ownership Plan and Trust ("ESOP") account, and 20,200 shares purchasable by Defendant Anderson upon the exercise of options granted under Patterson's Amended and Restated Equity Incentive Plan or its 2015 Omnibus Incentive Plan.

$1,714,654 in stock awards, $562,497 in option awards, and $29,232 in all other compensation.

28.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed. Defendant Anderson made no purchases and sold 10,000 shares of Company stock for $46.76 per share on June 14, 2017, for proceeds of $467,600. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

29.     According to the Form 8-K filed with the SEC on June 1, 2017, Defendant Anderson would continue to serve as a non-officer special adviser with the Company through July 1, 2019, and would "continue to be paid his current annualized salary of $820,000." On or about July 1, 2019, Defendant Anderson will be entitled to a severance payment of $1.1 million, to be paid in installments over the term of his non-competition provision, which extends to June 30, 2020.

30.     The Company's Schedule 14A filed with the SEC on July 29, 2016 stated the following about Defendant Anderson:

**Scott P. Anderson**[5] was elected the President and Chief Executive Officer of Patterson Companies, Inc. in April 2010, and became our Chairman in April 2013. Mr. Anderson has worked with Patterson since 1993. Prior to June 2006 when he became President of Patterson Dental, Mr. Anderson held senior management positions in the dental unit, including Vice

---

[5] Emphasis in original unless otherwise noted throughout.

President, Sales, and Vice President, Marketing. Mr. Anderson started his career as a territory sales representative in the dental business before becoming national equipment manager, manager of the San Francisco branch and manager of the Minnesota branch, two of Patterson's largest dental branch offices. Mr. Anderson became one of our directors in June 2010. He has served as a director of C.H. Robinson Worldwide, Inc. since January 2012. Mr. Anderson brings over 20 years of leadership and dental and animal health industry experience to our Board.

31.     Upon information and belief, Defendant Anderson is a citizen of Minnesota.

**Defendant Gugino**

32.     Defendant Ann B. Gugino ("Gugino") served as the Company's CFO and Treasurer from November 2014 until her resignation on March 1, 2018, and as its Executive Vice President from June 2015 to March 1, 2018. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Gugino beneficially owned 33,129 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Gugino owned over $1.4 million worth of Patterson stock.

33.     For the fiscal year ended April 29, 2017, Defendant Gugino received $1,122,187 in compensation from the Company. This included $428,754 in salary, $501,648 in stock awards, $162,498 in option awards, and $29,287 in all other compensation.

---

[6] Includes 9,139 shares allocated to Defendant Gugino's ESOP account, and 7,400 shares purchasable by Defendant Gugino upon the exercise of options granted under Patterson's Amended and Restated Equity Incentive Plan or its 2015 Omnibus Incentive Plan.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gugino made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 31, 2016 | 750 | $    48.86 | $    36,645 |
| August 29, 2016 | 750 | $    46.22 | $    34,665 |
| May 30, 2017 | 750 | $    43.83 | $    32,873 |
| July 11, 2017 | 750 | $    42.40 | $    31,800 |
| October 11, 2017 | 750 | $    36.73 | $    27,548 |
| January 11, 2018 | 750 | $    36.38 | $    27,285 |

Thus, in total, before the fraud was exposed, she sold 4,500 Company shares on inside information for which she received approximately $190,815. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

35.     According to the Form 8-K filed with the SEC on March 1, 2018, Defendant Gugino was entitled to a severance payment of $680,000 upon signing a separation and release agreement with the Company on July 31, 2018.

36.     The Company's Form 10-K filed with the SEC on June 28, 2017 stated the following about Defendant Gugino:

**Ann B. Gugino** became Vice President, Chief Financial Officer and Treasurer in November 2014 and was promoted to Executive Vice President, Chief Financial Officer and Treasurer in June 2015. She previously served as Vice President, Strategy & Planning since April 2012.

Before that, she was Vice President of Finance and Operations - Patterson Dental from 2008 until April 2012. She joined Patterson in 2000 as an assistant controller and became Controller - Patterson Dental in 2004. Prior to her career with Patterson, she worked for Ernst & Young LLP and achieved her Certified Public Accountant designation.

37.     Upon information and belief, Defendant Gugino is a citizen of Minnesota.

**Defendant Walchirk**

38.     Defendant Mark S. Walchirk ("Walchirk") served as the Company's CEO, President and as a member of the Board since November 20, 2017. According to the Form 8-K filed with the SEC on October 24, 2017, Defendant Walchirk was granted Patterson stock worth $2 million that will vest, in equal increments, on the first and second anniversaries of his employment.

39.     Defendant Walchirk's employment agreement provides for an annual base salary of $850,000, participation in the Company's other employee benefit plans and reimbursement for business expenses, annual cash incentive compensation of up to $437,500 for fiscal year 2018 (representing a pro-rata share) and $1,050,000 for any full year of employment thereafter, and   annual long-term equity-based incentive compensation pursuant to the Company's 2015 Omnibus Incentive Plan which awards consisted of 50% performance stock units, 25% stock options, and 25% restricted stock units, with an aggregate target value of $1,291,666 for fiscal year 2018 (representing a pro-rata share) and $3,100,000 for any full year of employment thereafter, at the time Defendant Walchirk joined the Company.

40.     The Company's Form 8-K filed with the SEC on October 24, 2017 stated the following about Defendant Walchirk:

> Mr. Walchirk, age 51, served as President of U.S. Pharmaceutical at McKesson Corporation since October 2012, where he held responsibility for McKesson's U.S. Pharmaceutical sales, distribution and customer service operations. Mr. Walchirk joined McKesson in April 2001 and held various leadership positions including President of McKesson Specialty Care Solutions and Chief Operating Officer of McKesson U.S. Pharmaceutical. Before joining McKesson, he spend [sic] 13 years in medical-surgical distribution and manufacturing with Baxter Healthcare, Allegiance Healthcare and Encompass Group, holding various leadership positions in sales, marketing, operations and business development.

41.     Upon information and belief, Defendant Walchirk is a citizen of Minnesota.

**Defendant Guggenheim**

42.     Defendant Paul A. Guggenheim ("Guggenheim") served as the President of Patterson Dental from 2010 to 2015, as CEO of Patterson Dental from May 2015 to May 2016, and as the Chief Innovation Officer of Patterson starting from June 2016 to June 1, 2017. He currently serves as the Western Region President of Patterson Dental. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Guggenheim beneficially owned 72,475 shares of the Company's common stock.[7] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Guggenheim owned nearly $3.2 million worth of Patterson stock.

---

[7] Includes 10,655 shares allocated to Defendant Guggenheim's ESOP account, and 6,600 shares purchasable by Defendant Guggenheim upon the exercise of options granted under Patterson's Amended and Restated Equity Incentive Plan or its 2015 Omnibus Incentive Plan.

43.   Upon information and belief, Defendant Guggenheim is a citizen of Minnesota.

**Defendant Misiak**

44.   Defendant David G. Misiak ("Misiak") served as the President of Patterson Dental North America from 1996 to May 11, 2018.   According to the 2017 Proxy Statement, on July 21, 2017, Defendant Misiak beneficially owned 24,455 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Misiak owned over $1 million worth of Patterson stock.

45.   During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed. Defendant Misiak made no purchases and sold 301 shares of Company stock for $45.57 per share on March 2, 2017, for proceeds of $13,717. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

**Defendant Rogan**

46.   Defendant Tim Rogan ("Rogan") served as the Vice President of Marketing, Merchandise of Patterson Dental from 2010 to 2017, and as the Vice President and General Manager, North America for Patterson Dental since May 2017.

---

[8] Includes 14,862 shares allocated to Defendant Misiak's ESOP account.

47.     Upon information and belief, Defendant Rogan is a citizen of Minnesota.

**Defendant Buck**

48.     Defendant John D. Buck ("Buck") has served as a Company director since 2006 and is a member of the Audit Committee. He has served as Chairman of the Board since June 1, 2017. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Buck beneficially owned 48,735 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Buck owned approximately $2.1 worth of Patterson stock.

49.     For the fiscal year ended April 29, 2017, Defendant Buck received $256,007 in compensation from the Company. This included $140,000 in fees earned or paid in cash, and $116,007 in stock awards. Defendant Buck now receives an additional $100,000 annual cash retainer for his service as non-executive Chairman.

50.     The Company's 2017 Proxy Statement stated the following about Defendant Buck:

> **John D. Buck** serves as our non-executive Chairman of the Board. Mr. Buck is the principal owner of Whitefish Ventures, LLC, a family investment fund. He has been its Chief Executive Officer since 2000. Mr. Buck was Chief Executive Officer of Medica, the second largest health benefits plan in Minnesota, from February 2002 to May 2003. From 1996 to 2000, he worked for Fingerhut Companies, Inc. with his last assignment as President and Chief Operating Officer, and played an integral role in developing the business services area of the company. Prior to Fingerhut, Mr. Buck was Vice President of Administration at Alliant Techsystems, a leading supplier of aerospace and defense technologies. Prior to that, Mr. Buck spent 21 years at Honeywell, Inc., including a four-year international posting, and most recently serving as Vice President of Administration. Mr. Buck is Chairman of the Board of Directors of Medica. He has been one of

our directors since December 2006. Mr. Buck brings financial, strategic and leadership experience, including health benefit plan experience, to our Board.

51.     Upon information and belief, Defendant Buck is a citizen of Minnesota.

**Defendant Blanco**

52.     Defendant Alex N. Blanco ("Blanco") has served as a Company director since April 20, 2017 and is a member of the Audit Committee.

53.     As reported by the Company on a Form 8-K filed with the SEC on May 1, 2017, Defendant Blanco "receive[s] compensation payable to non-employee directors serving on the Board as summarized under the caption 'Non-Employee Director Compensation' in the Company's annual proxy statements."

54.     The Company's 2017 Proxy Statement stated the following about Defendant Blanco:

> **Alex N. Blanco** has served as Executive Vice President and Chief Supply Chain Officer for Ecolab Inc., a global leader in water, hygiene and energy technologies and services that protect people and vital resources, since January 2013. From 1982 to 2012, Mr. Blanco held senior management positions at Procter & Gamble Co. ("P&G"), with his last position as Vice President Product Supply Global Beauty Sector. In his previous roles, he led the supply chain in other key P&G divisions and also had international assignments, in which Mr. Blanco was based outside of the United States from 1990 to 2004, having spent ten years in South America and four years in Europe, and during which time he had responsibility for Central and Eastern Europe, the Middle East and Africa. He has been a director of YMCA of the Greater Twin Cities since June 2015. He has been one of our directors since April 2017. Mr. Blanco brings extensive supply chain and international experience to our Board.

55.     Upon information and belief, Defendant Blanco is a citizen of Minnesota.

**Defendant Feragen**

56.     Defendant Jody H. Feragen ("Feragen") has served as a Company director since 2011, and is the Chair of the Audit Committee. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Feragen beneficially owned 25,897 shares of the Company's common stock.[9] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Feragen owned over $1.1 million worth of Patterson stock.

57.     For the fiscal year ended April 29, 2017, Defendant Feragen received $236,007 in compensation from the Company. This included $120,000 in fees earned or paid in cash, and $116,007 in stock awards.

58.     The Company's 2017 Proxy Statement stated the following about Defendant Feragen:

> **Jody H. Feragen** served as Executive Vice President and Chief Financial Officer of Hormel Foods Corp., a multinational marketer and manufacturer of brand name food and meat products, from November 2010 to October 2016. Ms. Feragen served as Hormel's Senior Vice President and Chief Financial Officer from January 2007 to October 2010 and Hormel's Vice President (Finance) and Treasurer from October 2005 to December 2006. She also served on Hormel's board of directors from 2007 to 2016. Ms. Feragen has served as a director, including a member of the audit and management organization and compensation committees, of Graco Inc., a supplier of technology and expertise for the management of fluids in both industrial and commercial applications, since September 2015. She has been one of our directors since September 2011. Ms. Feragen brings

---

[9] Includes 12,000 shares purchasable by Defendant Feragen upon the exercise of options granted under Patterson's 2001 Non-Employee Directors' Stock Option Plan or Patterson's Amended and Restated Equity Incentive Plan, and 1,000 shares held in a revocable trust of which Defendant Feragen is a trustee.

extensive experience in public company financial management to our Board.

59.     Upon information and belief, Defendant Feragen is a citizen of Minnesota.

**Defendant Lin**

60.     Defendant Sarena S. Lin ("Lin") served as a Company director from 2014 to March 13, 2018, and was a member of the Audit Committee. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Lin beneficially owned 19,488 shares of the Company's common stock.[10] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Lin owned approximately $835,840 worth of Patterson stock.

61.     For the fiscal year ended April 29, 2017, Defendant Lin received $216,007 in compensation from the Company. This included $100,000 in fees earned or paid in cash, and $116,007 in stock awards.

62.     The Company's 2017 Proxy Statement stated the following about Defendant Lin:

> **Sarena S. Lin** has served as President of Cargill Feed and Nutrition, a global animal feed and nutrition provider, since September 2014. Ms. Lin served as Corporate Vice President, Strategy and Business Development of Cargill, Inc., a global agriculture supply chain player and food producer, from May 2011 to September 2014. From September 1998 to March 2011, Ms. Lin was a Principal at McKinsey & Company, a global management consulting firm, where she was Managing Partner of McKinsey's Taipei office, as well as the co-founder of McKinsey's Sourcing Center in

---

[10] Includes 7,000 shares purchasable by Defendant Lin upon the exercise of options granted under Patterson's 2001 Non-Employee Directors' Stock Option Plan or Patterson's Amended and Restated Equity Incentive Plan.

Shanghai. She has been one of our directors since March 2014. Ms. Lin brings global and strategic management expertise to our Board.

**Defendant Rudnick**

63.     Defendant Ellen A. Rudnick ("Rudnick") has served as a Company director since 2003. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Rudnick beneficially owned 42,235 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Rudnick owned over $1.8 million worth of Patterson stock.

64.     For the fiscal year ended April 9, 2017, Defendant Rudnick received $231,007 in compensation from the Company. This included $115,000 in fees earned or paid in cash, and $116,007 in stock awards.

65.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Rudnick made the following sales of Company stock, and made no purchases of Company stock. On September 11, 2015, Defendant Rudnick sold 12,000 shares of Company stock for $45.45 per share. On March 2, 2017, Defendant Rudnick sold 3,000 shares of Company stock for $45.70 per share. Thus, in total, Defendant Rudnick sold 15,000 shares for which she received approximately $682,500. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

66.    The Company's 2017 Proxy Statement stated the following about Defendant Rudnick:

**Ellen A. Rudnick** has served as Senior Advisor on Entrepreneurship at the University of Chicago Booth School of Business since July 2016. Ms. Rudnick was previously the Executive Director and Clinical Professor of the Polsky Center for Entrepreneurship and Innovation at the University of Chicago Booth School of Business since March 1999. She served as Chairman of Pacific Biometrics, a medical diagnostics company which she co-founded, from 1993 to 1999; President of HCIA and CEO of Healthcare Knowledge Resources, both healthcare information service companies, from 1990 to 1992; and in a variety of capacities at Baxter Healthcare from 1975 to 1990, including Corporate Vice President of Baxter Healthcare and President and Founder of Baxter Management Services Division. Ms. Rudnick served as Founder and Chairman of CEO Advisors, a consulting firm established in 1992. Ms. Rudnick serves as director of First Midwest Bancorp, Inc., HMS Holdings Corporation and Liberty Mutual Insurance Company. She has been one of our directors since December 2003. Ms. Rudnick brings experience with small businesses (our customer base), the medical products industry, academia and entrepreneurship to our Board.

## Defendant Schrimsher

67.    Defendant Neil A. Schrimsher ("Schrimsher") has served as a Company director since 2014. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Schrimsher beneficially owned 19,488 shares of the Company's common stock.[11] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Schrimsher owned approximately $835,840 worth of Patterson stock.

---

[11] Includes 12,000 shares purchasable by Defendant Schrimsher upon the exercise of options granted under Patterson's 2001 Non-Employee Directors' Stock Option Plan or our Amended and Restated Equity Incentive Plan.

68.     For the fiscal year ended April 29, 2017, Defendant Schrimsher received $216,007 in compensation from the Company. This included $100,000 in fees earned or paid in cash, and $116,007 in stock awards.

69.     The Company's 2017 Proxy Statement stated the following about Defendant Schrimsher:

> **Neil A. Schrimsher** has served as Chief Executive Officer of Applied Industrial Technologies, Inc., one of North America's largest industrial parts distributors, since October 2011 and was also elected its President in August 2013. From January 2010 to August 2011, Mr. Schrimsher was Executive Vice President of Cooper Industries, a global electrical products manufacturer, where he led multiple businesses in Cooper's Electrical Products Group and headed numerous domestic and international growth initiatives. Mr. Schrimsher joined Cooper Industries in May 2006 as the President of Cooper Lighting. Mr. Schrimsher's other experience includes senior leadership positions for Siemens Energy & Automation, part of Siemens AG, the global electronics and electrical engineering company. He began his career at General Electric Company and rose through a succession of positions in GE Lighting. He has served as a director of Applied Industrial Technologies, Inc. since October 2011. He has been one of our directors since March 2014. Mr. Schrimsher brings wholesale distribution and executive leadership experience to our Board.

**Defendant Vinney**

70.     Defendant Les C. Vinney ("Vinney") served as a Company director from 2008 to September 17, 2018. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Vinney beneficially owned 30,561 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Vinney owned approximately $1.3 million worth of Patterson stock.

71.     For the fiscal year ended April 29, 2017, Defendant Vinney received $231,007 in compensation from the Company. This included $115,000 in fees earned or paid in cash, and $116,007 in stock awards.

72.     The Company's 2017 Proxy Statement stated the following about Defendant Vinney:

> **Les C. Vinney** is the former President and Chief Executive Officer of STERIS Corporation, a leading provider of infection prevention and surgical products and services for the healthcare, pharmaceutical and research markets. He was President and Chief Executive Officer of STERIS Corporation from 2000 to 2007, after which time he served as Senior Advisor to STERIS Corporation until his retirement in 2009. Prior to becoming its President and Chief Executive Officer, he was such company's Senior Vice President, Finance and Operations. He previously held various senior management positions with Goodrich Corporation (formerly B.F. Goodrich), including Chief Financial Officer. Mr. Vinney also serves as a director of Campbell Soup Company, where he has served as non-executive Chairman of the Board since November 2015. He has been one of our directors since December 2008. Mr. Vinney brings financial, strategic and industry experience, including experience as an executive officer of a healthcare products company, to our Board.

**Defendant Wiltz**

73.     Defendant James W. Wiltz ("Wiltz") has served as a Company director since 2001. He formerly served as the Company's interim President and CEO from June 2017 to November 2017, and as the Company's President and CEO from 2005 to 2010. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Wiltz beneficially owned 71,300 shares of the Company's common stock.[12] Given that the price per share

---

[12] Of the shares reported as beneficially owned, 6,748 shares are held in trust for members of Defendant Wiltz's family and 12,817 shares are held in a revocable trust of

of the Company's common stock at the close of trading on July 21, 2017 was $42.89, Wiltz owned nearly $3.1 million worth of Patterson stock.

74.    For the fiscal year ended April 29, 2017, Defendant Wiltz received $206,007 in compensation from the Company. This included $90,000 in fees earned or paid in cash, and $116,007 in stock awards.

75.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Wiltz made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| September 25, 2015 | 5,000 | $ 45.14 | $ 225,700 |
| February 27, 2017 | 30,000 | $ 45.25 | $ 1,357,500 |
| February 28, 2017 | 10,000 | $ 45.40 | $ 454,000 |
| March 1, 2017 | 10,000 | $ 45.65 | $ 456,500 |
| March 9, 2017 | 5,000 | $ 44.52 | $ 222,600 |
| March 15, 2017 | 10,000 | $ 45.52 | $ 455,200 |

Thus, in total, before the fraud was exposed, he sold 70,000 Company shares on inside information for which he received approximately $3.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

---

which Defendant Wiltz is a trustee.

76.     The Company's 2017 Proxy Statement stated the following about Defendant Wiltz:

> **James W. Wiltz** became our Interim President and Chief Executive Officer in June 2017. Mr. Wiltz served as our President and Chief Executive Officer from May 2005 until his retirement in April 2010. Mr. Wiltz served as our President and Chief Operating Officer from April 2003 through May 2005. He began working with us in September 1969. From 1996 to 2003, Mr. Wiltz served as President of our subsidiary, Patterson Dental Supply, Inc. [s]ince January 2010, Mr. Wiltz has served as a director of HealthEast Care System, a non-profit healthcare provider, and on its audit and finance committees. He has been one of our directors since March 2001. Mr. Wiltz brings over 40 years of leadership, strategic and industry experience working for Patterson to our Board.

77.     Upon information and belief, Defendant Wiltz is a citizen of Minnesota.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

78.     By reason of their positions as officers, directors and/or fiduciaries of Patterson and because of their ability to control the business and corporate affairs of Patterson, the Individual Defendants owed Patterson and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Patterson in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Patterson and its shareholders so as to benefit all shareholders equally.

79.     Each director and officer of the Company owes to Patterson and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

80.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Patterson, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

81.     To discharge their duties, the officers and directors of Patterson were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

82.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Patterson, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Patterson's Board at all relevant times.

83.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect

the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. They also had a duty not to engage in the Antitrust Misconduct.

84.    To discharge their duties, the officers and directors of Patterson were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Patterson were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Minnesota and the United States and pursuant to Patterson's own internal guidelines, including its Principles of Business Conduct and Code of Ethics and its Corporate Governance Guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Patterson conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices,

to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Patterson and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Patterson's operations would comply with all laws and Patterson's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

85.    Each of the Individual Defendants further owed to Patterson and the shareholders the duty of loyalty requiring that each favor Patterson's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

86.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Patterson and were at all times acting within the course and scope of such agency.

87.    Because of their advisory, executive, managerial, and directorial positions with Patterson, each of the Individual Defendants had access to adverse, non-public information about the Company.

88.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Patterson.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

89.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in

concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

90. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) engage in the Antitrust Misconduct; (iii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iv) artificially inflate the Company's stock price.

91. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Patterson was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

92. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the

Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

93.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Patterson and was at all times acting within the course and scope of such agency.

## PATTERSON'S PRINCIPLES OF BUSINESS CONDUCT AND CODE OF ETHICS

94.    The Company has established and publishes on its website Principles of Business Conduct and Code of Ethics (the "Code of Ethics"), which states, in relevant part: "Employees of Patterson will comply with Patterson policies, the ethical standards and legal requirements of each country in which business is conducted, as well as United States laws that apply in other countries."

95.    The Code of Ethics states, in regard to "Complying With Laws," that:

> Each of us must act within the letter and spirit of the laws and regulations affecting our business. In the course of their employment with Patterson, employees may have frequent business dealings with suppliers, customers and competitors. ***Patterson expects its employees to observe and comply with all federal, state and local laws and regulations in the course and scope of their employment.*** Each employee is expected to cooperate with Patterson regarding any legal compliance programs maintained by Patterson.

(Emphasis added.)

- 31 -

96.    Regarding reporting, the Code of Ethics states:

Patterson is committed to accurate and timely disclosure of information as set forth by the United States securities laws. As a public company, Patterson submits quarterly financial reports in accordance with United States generally accepted accounting principles. No willful or knowingly false or misleading statement or omission will be made in any disclosure, report or registration statement filed with the SEC.

97.    Regarding "Material Nonpublic Information and Securities Trading," the Code of Ethics states, in relevant part:

To protect the shareholders of Patterson and to promote confidence in the capital markets in general, securities legislation and Patterson policy prohibit persons who have access to material undisclosed information about Patterson from trading in Patterson securities or informing others of that information before it has been generally disclosed to the public.

* * *

***Employees, members of their immediate families, members of their household and companies controlled by such persons (herein collectively referred to as "insiders") may not buy or sell Patterson securities with the knowledge of a material fact or material change with respect to Patterson that has not been generally disclosed***. This is referred to as "insider trading."

* * *

A "material fact" with respect to Patterson is a fact that significantly affects, or would reasonably be expected to have a significant effect on, the market price or value of its securities.

* * *

Either positive or negative information may be material.

(Emphasis added.)

98.    The Code of Ethics provides, regarding "Consequences of Non-Compliance," that:

Employees who violate this policy, including engaging in insider trading or tipping, shall be subject to disciplinary measures up to and including termination from employment. In addition, violations of this policy may result in criminal and civil liability for you and Patterson.

99.    With respect to "Competing Ethically," the Code of Ethics provides, in relevant part:

***Patterson fully complies with the antitrust laws and fair trade practices of the United States*** and all other applicable jurisdictions.

It is impossible to define every situation in which applicable competition laws may come into play. However, the following additional specific guidelines should be observed by all employees.
- ***Never discuss pricing policy with competitors***.
- ***Never discuss or imply that Patterson would divide a market with a competitor or respect a competitor's territory as "off limits" to Patterson***.
- Never engage in a joint selling activity with a competitor.
- ***Never ask a vendor to cease doing business with a competitor***. All communications with vendors, other than routine business transactions in the normal course and scope of an employee's job, should be made through the Marketing Department at the Corporate Office.
- ***Avoid even the appearance of improper or collusive conduct when meeting with competitors or vendors at trade shows or trade association meetings***.
- ***Do not disparage a competitor's or vendor's products or services***, even if Patterson does not carry that vendor's product line.
- Never quote a price to a customer unless Patterson is prepared to sell the product at the quoted price.

Seek guidance from your manager whenever questions arise related to competitive practices, or if you are uncertain as to whether a particular action or practice may violate the antitrust laws of the jurisdiction in which

CASE 0:18-cv-02818-PJS-HB   Document 1   Filed 10/01/18   Page 34 of 95

you work. Information is available from your manager or the Human Resources Department for specific locations.

(Emphasis added.)

100.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Antitrust Misconduct and issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 14(a), 10(b) and 20(a) of the Exchange Act. Moreover, five of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## PATTERSON'S CORPORATE GOVERNANCE GUIDELINES

101.    The Company's has adopted Corporate Governance Guidelines "to guide the Company and the Board on matters of Corporate Governance."

102.    Regarding the "Role of the Board of Directors," the Corporate Governance Guidelines state, in relevant part:

> ***The basic responsibility of the Board is to exercise its business judgment*** to act in what it reasonably believes to be in the best interest of the Company and its shareholders. Within this framework, ***the Board also considers the Company's ethical behavior and may consider the interests of other constituents, including the Company's customers, employees and the communities in which it functions***.

- 34 -

* * *

*The Board provides oversight with respect to the strategic direction, risk management and key policies of the Company*. It approves major initiatives, advises on key financial and business objectives, and monitors progress with respect to these matters including without limitation enterprise risk management.

*The Board, directly and through its Audit Committee, provides oversight of* the integrity of the Company's financial statements and the financial reporting process, the systems of internal accounting and financial controls, the internal audit function, the annual independent audit of the Company's financial statements, and *the Company's legal compliance and ethics programs.*

(Emphasis added.)

103.    Regarding the "Conduct and Ethics Standard for Directors," the Corporate

Governance Guidelines state, in relevant part:

*Directors are subject to applicable provisions of the Company's Principles of Business Conduct and Code of Ethics*. Among other things, Directors must conduct themselves in a manner that avoids actual or apparent conflicts of interest and that protects the Company's business reputation.

* * *

*Directors, in the course of their Company duties, must comply fully with all federal and state laws applicable to the Company's businesses, and with applicable Company policies* (including policies relating to use of confidential information and insider trading).

(Emphasis added.)

104.    Defendants Anderson, Buck, Blanco, Feragen, Lin, Rudnick, Schrimsher,

Vinney, and Wiltz violated the Corporate Governance Guidelines by allowing the

Company to engage in the Antitrust Misconduct and making and/or causing the Company to make the false and misleading statements and omissions discussed herein and to violate applicable laws and regulations, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. Further, Defendants Anderson, Wiltz and Rudnick violated the Corporate Governance Guidelines by engaging in insider trading while in possession of material, nonpublic information about the Company.

## PATTERSON'S AUDIT COMMITTEE CHARTER

105.    The Company's Audit Committee Charter provides that the responsibilities of the Audit Committee include, *inter alia*:

> The Committee should take the appropriate actions to **set the overall corporate "tone" for quality financial reporting, sound business risk practices and ethical behavior.**

(Emphasis added.)

106.    The Company's Audit Committee Charter provides that such responsibilities include reviewing and discussing the company's quarterly and annual financial statements, as follows:

> • The Committee shall meet to review and discuss the quarterly financial statements, including Management's Discussion and Analysis of Financial Condition and Results of Operations, with management and the independent registered public accountants prior to the filing of the Company's Quarterly Report on Form 10-Q. Also, the Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent registered public accountants under the standards of the PCAOB (United States).

• The Committee shall meet to review and discuss the annual audited financial statements, including Management's Discussion and Analysis of Financial Condition and Results of Operations, with management and the independent registered public accountants prior to the filing of the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of Form 10-K). Also, the Committee shall discuss the results of the annual audit and any matters required to be communicated to the Committee by the independent registered public accountants under the standards of the PCAOB (United States).

107.   The Company's Audit Committee Charter also provides that such responsibilities include reviewing the Company's anti-fraud programs and controls, compliance and ethics programs, and discussing policies with respect to financial risk exposures, stating, in relevant part:

• The Committee shall review with senior management the Company's overall anti-fraud programs and controls.

• The Committee shall review the Company's compliance and ethics programs, including consideration of legal and regulatory requirements, and shall review with management its periodic evaluation of the effectiveness of such programs. The Committee shall review the Company's code of conduct and programs that management has established to monitor compliance with such code. The Committee shall receive any corporate attorneys' reports of evidence of a material violation of securities laws or breaches of fiduciary duty by the Company.

• The Committee shall discuss the Company's policies with respect to major financial risk exposures, including fraud. The Committee also shall discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

108.   In contravention of their duties as members of the Audit Committee, Defendants Buck, Blanco, Feragen, and Lin failed to effectively discuss the risks associated with the Antitrust Misconduct, allowed the Company to operate with

inadequate internal controls, and failed to set an appropriate corporate tone for sound business risk practices and ethical behavior.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

109.    Patterson is a full-service, national distributor that sells dental supplies, equipment, and services to dental practitioners throughout the United States. It is the second largest distributor of dental supplies and equipment in the United States.

110.    In the dental supplies and equipment industry, manufacturers typically sell to distributors, who, in turn, sell a wide range of equipment and supplies to dental service providers at a healthy margin. As individual manufacturers do not produce the range of products necessary to run a dentistry practice, individual dentists typically purchase dental supplies and dental equipment through distributors such as Patterson.

111.    Patterson, along with competitors Benco and Schein, collectively control about 85% of the sale of all dental products and services made through distributors in the United States.

112.    Due to economies of scale and the need to obtain products from certain manufacturers that produce a large proportion of the top-selling supplies to run a dentistry practice, there are significant barriers to entry to the distributor market.

113.    GPOs, or buying groups, are collectives of individual buyers who band together to negotiate better deals by buying as a group.

**The Antitrust Misconduct--as Revealed in the FTC, Antitrust and SourceOne Actions**

114.    The Individual Defendants caused the Company, with Benco and Schein, to engage in the Antitrust Misconduct—a conspiracy in restraint of trade, whereby the companies agreed to refuse to offer discounted prices or otherwise negotiate with GPOs, agreed to fix margins on dental supplies and equipment, agreed not to poach one another's customers or sales representatives, and agreed to block the entry and expansion of rival distributors. This agreement was made and enforced by senior executives of the Company.

115.    Patterson, Schein, Benco, and Burkhart Dental Supply Company ("Burkhart") were involved in an agreement not to compete on price. These distributors agreed to charge similar margins on dental supplies and equipment, and raised their margins in lockstep every year since 2005.

116.    Since February 2013 and continuing at least into 2015, Patterson, Schein, and Benco executives acted according to an agreement they entered into:[13]

> not to provide discounts to or otherwise contract with Buying Groups composed of independent dentists (the "agreement"). The agreement sought to prevent the falling of prices charged by the Distributors to independent dentists. Senior executives of Benco, Schein, and Patterson entered into, ensured compliance with, and monitored the agreement through a series of private inter-firm communications. They also reaffirmed their conscious commitment to concerted action on various occasions.

FTC Complaint ¶ 8.[14]

---

[13] The FTC's complaint alleges that Benco and Schein entered into an agreement no later than July 2012, and Patterson joined the agreement in February 2013.

117.     According to the Antitrust Action complaint, Patterson, Schein, Benco, and Burkhart agreed to boycott and exclude lower-priced distributors by pressuring manufacturers to cut such competitors off from access to such manufacturer's products.

118.     According to the Antitrust Action complaint, a former Patterson employee stated that during the period of time that he was responsible for dental sales, there was a nationwide policy not permitting sales of products below minimum gross margin thresholds (of 32% on equipment and 28-30% on supplies), and that it was known throughout the Company's sales division that Schein also would not go below the same minimum gross margin thresholds.

119.     According to the Antitrust Action complaint, a former sales representative who worked for Patterson and then Benco from 2000 through 2014 learned about margin thresholds at both companies from management, in sales meetings, and training sessions—including handouts provided at monthly meetings, and stated that the minimum margins remained similar throughout his 15-year career as a sales representative.

120.     Patterson, Schein, Benco, and Burkhart agreed not to pursue one another's existing or nearly-consummated business by competing on price.

---

[14]  References to the FTC Complaint refer to the unredacted public version of the complaint filed on March 14, 2018, attached hereto as Exhibit 1.

121.    Moreover, Patterson, Schein, Benco, and Burkhart also agreed not to poach one another's sales representatives to enforce the agreement not to compete on price, as sales in their industry are relationship driven.

122.    Patterson, Schein, Benco, and Burkhart moreover boycotted entities who sought to enter the market and compete on price by using their power over manufacturers to force manufacturers to coerce new entrants to raise prices or face being cut off from purchasing products.

123.    Patterson can and does exert a particularly strong influence over A-dec, Inc. and Midmark Corp., manufacturers of dental chairs, as Patterson distributes a large share of both manufacturers' dental chairs and related supplies and equipment sold domestically, which provides Patterson with the power to enforce boycotts.

124.    According to the Antitrust Action complaint, Patterson and other named distributors used their influence to force Instrumentarium (a dental equipment manufacturer) to deny requests from a distributor who competed on price to sell Instrumentarium products and to force a number of manufacturers to terminate their relationships with at least one price-competing distributor. The Antitrust Action complaint refers to threats by Patterson, Schein, Benco, and Burkhart that were "sometimes made jointly on the same call, and most often coming on the same day within hours of each other," providing evidence of coordination. Further, according to the Antitrust Action complaint, when Instrumentarium allowed a price-competing distributor to make one final national sale before restricting the distributor to the State of Texas, that

sale was to a dentist for whose business none of Schein, Patterson, Benco, or Burkhart had submitted a bid.

125.    According to the Antitrust Action, in response to attempts by Amazon.com to enter the dental supply market, Schein, Patterson, and Benco agreed to boycott manufacturers who supplied Amazon.com.

126.    Schein, Patterson, and Benco, according to the Antitrust Action complaint, prevented online medical supply sellers from supplying dentists with products that cross over between dental and medical offices, resulting in such sellers requiring buyers to affirm that they are not dental offices in order to purchase products.

127.    Per the Antitrust Action, Patterson sought to conceal the Antitrust Misconduct; in one instance, a Patterson employee emailing a Benco employee on July 21, 2014 regarding a coordinated boycott of the Arizona Dental Association's 2015 trade show, stated, in relevant part: "Please discuss [this] live and no further emails." According to the Antitrust Action complaint, Defendant Misiak gave a similar instruction to Patterson employees on the same day: "Please discuss live and no emails on this topic," and, on September 30, 2013, shortly before a boycott of the Texas Dental Association's 2014 trade show, Schein's President, Tim Sullivan, requested that Defendant Anderson call him directly.

128.    Perceiving GPOs as a threat to their healthy margins, Patterson, Benco and Schein conspired to prevent GPOs from successfully competing in the dental supply and equipment distribution market.

129.     According to the FTC complaint, in February 2013, after Benco suspected that Patterson was offering discounts to a New Mexico GPO, Benco's managing director Chuck Cohen sent an email to Defendant Guggenheim, stating: "Just wanted to let you know about some noise I've picked up from New Mexico. FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups . . . and our team understands that policy." FTC Complaint ¶ 37. Defendant Guggenheim forwarded the Benco email to other Patterson executives, Defendants Rogan and Misiak, who was Vice President of Sales at the time. Defendant Guggenheim then replied to the Benco executive, stating: "Thanks for the heads up. I'll investigate the situation. We feel the same way about these." FTC Complaint ¶ 39.

130.     According to the FTC Complaint, as a result of the agreement, Patterson executives instructed their sales persons not to deal with GPOs. FTC Complaint ¶ 40.

131.     According to the FTC Complaint, in a February 27, 2013 e-mail, Defendant Misiak instructed his sales team to avoid selling Atlantic Dental Care, a customer that Patterson, Schein, and Benco believed to be a GPO, stating that both Benco and Schein were also rejecting such buyers: "Confidential and not for discussion..our [sic] 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me." FTC Complaint ¶ 43.  According to the FTC Complaint, in another February 27, 2013 email to Defendant Guggenheim, Defendant Misiak stated: "I'm concerned that Schein and Benco sneak into these co-op bids and deny it." FTC Complaint ¶ 43.

132.    According to the FTC complaint, Benco and Schein ultimately decided that Atlantic Dental Care was not a GPO and submitted bids. In a June 2013 email exchange between Defendant Guggenheim and Cohen at Benco executive, Defendant Guggenheim asked for clarification about Benco's agreement with Atlantic Dental Care, stating:

> Reflecting back on our conversation earlier this year, could you shed some light on your business agreement with Atlantic Dental Care? . . . I'm wondering if your position on buying groups is still as you articulated back in February? . . . Sometimes these things grow legs without our awareness!

FTC Complaint ¶ 48. Cohen responded by informing Defendant Guggenheim that Atlantic Dental Care was not a GPO, and therefore the bid was consistent with the agreement. Defendant Guggenheim responded: "Sounds good Chuck. Just want to clarify where you guys stand." FTC Complaint ¶ 49. Thereafter, according to the FTC Complaint, Patterson competed for Atlantic Dental Care's business. FTC Complaint ¶ 50.

133.    According to the FTC Complaint, on August 2, 2013, a new Patterson executive asked Defendants Rogan and Misiak: "Is it worth it to explore GPO??????? . . . I used to get 1 [request] per month . . . ," to which Defendant Rogan responded: "We don't need GPO's in the dental business. Schein, Benco, and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry." FTC Complaint ¶ 51.

134.    When Patterson announced the creation of its Special Markets Division intended to handle large accounts on September 4, 2013, according to the FTC Complaint, the Company internally announced in a memorandum to all regional and

branch managers that it would exclude GPOs as potential customers. FTC Complaint ¶ 52.

135.     According to the FTC Complaint, Patterson, Schein, and Benco engaged in a planned and coordinated strategy with respect to GPOs formed by state dental associations, specifically the Texas Dental Association ("TDA") and the Arizona Dental Association ("AZDA"). FTC Complaint ¶¶ 57-70.

136.     Patterson, Schein, and Benco used their power over state dental associations to exclude would-be competitors since 2013. According to the Antitrust Action complaint, when price-competing competitor SourceOne teamed up with the TDA to provide price-competing distribution systems (the "TDA GPO"), Schein, Patterson, and Benco threatened to boycott manufacturers working with SourceOne, leading SourceOne to lose access to 75% of its top selling products. According to the Antitrust Action complaint, several manufacturers indicated to SourceOne that their decision to stop selling to SourceOne was a result of threats from Schein, Patterson, and Benco.

137.     According to the Antitrust Action complaint, Schein, Patterson, and Benco boycotted the trade shows of state dental associations that were doing business with SourceOne, and strong-armed manufacturers into not attending the trade shows of the TDA and the AZDA in 2014.

138.     Schein, Patterson, and Benco, according to the Antitrust Action , boycotted dentists who purchased supplies from SourceOne by withholding service and repair for

installed equipment, or performing such repairs at a higher cost and with significant delays.

139.    The Court's decision that denied in part defendants' motion for summary judgment in the SourceOne Action, which was entered on April 12, 2018, Patterson's San Antonio regional manager, John Hyden, received a call from Benco's San Antonio regional manager some time before October 23, 2013 regarding participation in the TDA's annual trade show in light of the TDA GPO. After Hyden escalated the issue to his manager, Clint Edens ("Edens"), Edens emailed his superiors, stating: "[a]s for Patterson, we have briefly discussed this TDAPerks site [the TDA GPO] (not the source) with our dealer competitors at the local San Antonio & Houston level . . . I am committed to pulling from the TDA if they do not reconsider competing with us via TDA perks [sic]." SourceOne Order at 2-3 (alteration in original).

140.    According to the FTC Complaint, on December 11, 2013, Benco's Texas regional manager stated, in regard to the TDA GPO: "I have been talking to the directors of Schein and Patterson. We are going to be taking a stand together against them." According to the FTC Complaint, that same month, a Schein regional manager in Texas visited a Patterson branch manager who relayed Patterson would not be attending the TDA trade show. According to the FTC Complaint, Schein's zone manager conveyed this information to his boss, stating: "FYI Patterson pulled out of [the TDA] Convention. I firmly believe they made the move expecting us to follow suit." FTC complaint ¶ 71.

- 46 -

141.    According to the FTC Complaint, on January 6, 2014 Defendant Misiak spoke on the phone for 14 minutes with Schein's Vice President of Sales, who sent an email to Defendant Misiak on January 21, 2014, with the subject "Texas" that stated: "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple of days."  FTC Complaint ¶ 71.

142.    In the same email thread, Defendant Misiak expressed his frustration to Defendant Rogan, stating that Schein's VP of Sales "already told me that they were out. Full blown!" Defendant Rogan: "That sucks. You should call him. 'Thought I could trust you' type of conversation." SourceOne Order at 4.

143.    The complaint filed in the SourceOne Action on September 21, 2015 alleges that in March 2014, Patterson representatives met privately with TDA representatives to demand that TDA end its relationship with SourceOne and the TDA GPO, or Patterson would not attend TDA's trade show or advertise in TDA's publications.

144.    The Antitrust Action complaint also quotes communications in furtherance of the anticompetitive conduct aimed at SourceOne and the state dental associations, including a February 1, 2014 internal email from a dental distributor that stated that "Patterson was encouraging Schein to support them in pulling out of meetings" for state dental associations that supported SourceOne.  The Antitrust Action complaint also quotes a March 31, 2014 email thread forwarded by David McCarley of McCarley Dental that stated, in relevant part:

some of the vendors say that they were told by both Patterson and Schein not to have anything to do with TDA Perks or they would shelve their products nationwide

\* \* \*

Big Dental Suppliers are sending false info to Dentists [about SourceOne]. Patterson reps have even called the TDA pretending to be Dentists complaining. We have traced the calls back to the Reps. . . . If this is true I am sure the Board will cut ties immediately with SourceOne.

145.    According to the FTC Complaint, on April 16, 2014, Cohen at Benco sent an email to a Schein executive and Defendant Guggenheim that forwarded an article about the TDA GPO, stating: "Thought you'd be interested in this 'essay' from our friends at the TDA." FTC complaint ¶ 71.

146.    According to the Antitrust Action complaint, an April 21, 2014 SourceOne email states:

TDA has received a significant number of cancelations for their annual session (April 30 – May 3) from a variety of manufacturers previously confirmed to exhibit. Many of them cited pressure from both Henry Schein and Patterson as the reason for the last minute cancelation. Many of them informed the TDA that they were specifically threatened by both companies that if they did not cancel their attendance at the conference, various unpleasant things would happen to them.

147.    According to the FTC Complaint, ultimately, neither Patterson, Schein nor Benco attended the 2014 TDA trade show. FTC Complaint ¶ 72.

148.    According to the FTC Complaint, Benco, Schein, and Patterson also discussed withdrawing from the AZDA annual trade show in response to AZDA's creation of a buying group in July 2014, with Benco's Arizona regional manager having sent an email to a Patterson branch manager in Arizona on July 21, 2014 that stated: "I

know that Patterson, Schein and Benco boycotted the Texas Dental Association meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in AZ."  FTC Complaint ¶ 73.

149.    Patterson's branch manager responded, "[i]f the AZDA has in fact signed on with SourceOne (which it looks like they have), we will be pulling our sponsorship and attendance of the state meeting." SourceOne Order at 6.

150.    According to the Antitrust Action complaint, July 2014 communications between a Patterson employee and a Benco employee revealed that Patterson and Benco discussed pulling their sponsorships of the AZDA trade show the following year, and that Schein, Patterson, and Benco expressed to each other that none of the three would attend this AZDA meeting.

151.    Moreover, according to the Antitrust Action complaint, an August 2014 email from a Benco employee noted disappointment with the AZDA's decision to directly compete with Benco and its fellow distributors, in addition to noting that leadership at Benco, Patterson, and Schein indicated that they would evaluate the companies' future participation in AZDA events if the AZDA maintained its affiliation with SourceOne.

152.    According to the FTC Complaint, following these, and likely other, inter-firm communications in the summer of 2014, Benco, Schein, and Patterson each withdrew from the AZDA trade show. FTC Complaint ¶ 73.

153.    The Antitrust Action complaint alleges that there was no pro-competitive purpose for the boycott of the TDA and AZDA trade shows, and that Schein, Patterson, and Benco forfeited substantial deposits associated with attendance.

154.    The court in SourceOne found that failing to attend the TDA and AZDA trade shows was "not clearly in [the distributors] own individual economic self-interest." SourceOne Order at 15. Indeed, as Patterson branch manager Bob Ingersoll and salesperson Christopher Cobb testified at their depositions that if Schein and Benco attended, Patterson's failure to attend would be to the Company's economic disadvantage. *Id.* at 17.

155.    The scheme to conspire to boycott GPOs continued into 2014 and 2015, with executives from each of the three companies confirming the existence of an agreement in restraint of trade. For example, in June 2014, according to the FTC complaint, a Patterson executive wrote in a text message: "we've signed an agreement that we won't work with GPO's." FTC Complaint ¶¶ 61, 62.

156.    Another example, is that, in May 2015, according to the FTC Complaint, Benco rejected a GPO, and a Benco executive commented in an internal email: "The best part about calling these [buying groups] is I already KNOW that Patterson and Schein have said NO." FTC Complaint ¶ 63.

157.    Also according to the FTC complaint, in June 2015, a Benco executive informed a Benco sales representative: "We don't allow [volume discount] pricing unless

there is common ownership. Neither Schein nor Patterson do either." FTC Complaint ¶ 64.

158.   The communications and actions above provide evidence of a conscious commitment and agreement between Benco, Schein, and Patterson to refuse to deal with GPOs.

### **Materially False and Misleading Statements**

159.   On June 24, 2015, Patterson filed its annual report with the SEC announcing financial results for the quarter and year ended April 25, 2015, on Form 10-K (the "2014-2015 10-K"), signed by Defendants Anderson, Gugino, Buck, Feragen, Lin, Rudnick, Schrimsher, Vinney and Wiltz. The Company reported net income of $223 million, net sales of $3.9 billion, and earnings from continuing operations of $1.81 per share for the year. Regarding competition, the 2014-2015 10-K stated, in relevant part:

> We approach our markets by emphasizing and delivering a value-added model to the practitioner. ***To differentiate ourselves from our competition, we deploy a strategy of premium customer service*** with multiple value-added components, a highly qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and distribution centers*, **and competitive pricing.***

(Emphasis added.)

160.   Attached to the 2014-2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002

("SOX") signed by Defendants Anderson and Gugino attesting to the accuracy of the 2014-2015 10-K.

161.   On June 29, 2016, Patterson filed its annual report with the SEC announcing financial results for the quarter and year ended April 30, 2016, on Form 10-K (the "2015-2016 10-K"), signed by Defendants Anderson, Gugino, Buck, Feragen, Lin, Rudnick, Schrimsher, Vinney and Wiltz. The Company reported net income of $187 million, net sales of $5.39 billion, and earnings from continuing operations of $1.90 per share for the year. Regarding competition, the 2015-2016 10-K stated, in relevant part:

> We compete with other distributors, as well as several manufacturers, of dental and animal health products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. ***To differentiate ourselves from our competition we deploy a strategy of premium customer service*** with multiple value-added components, a highly qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and fulfillment centers, ***and competitive pricing***.
>
> * * *
>
> Significant price reductions by our competitors could result in a similar reduction in our prices. Any of these competitive pressures may materially adversely affect our operating results.

(Emphasis added.)

162.   The 2015-2016 10-K also provided an outline of the Company's "Business Strategy," which did not include the Antitrust Misconduct.

163.   Attached to the 2015-2016 10-K were SOX certifications signed by Defendants Anderson and Gugino, attesting to the accuracy of the 2015-2016 10-K.

164.    The statements in ¶¶ 159-163 were materially false and misleading because they made misleading statements that failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) as a result of the Antitrust Misconduct, the Company's revenue and earnings were fraudulently inflated; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, Patterson's public statements were materially false and misleading at all relevant times.

**Management Transition**

165.    On June 1, 2017, weeks before filing its annual report for the year ended April 30, 2017, the Company abruptly filed a Form 8-K and issued a press release revealing that:

> Scott P. Anderson has stepped down as the Company's President, Chief Executive Officer and Chairman of the Board, effective immediately, and that James W. Wiltz, a current director and the Company's former Chief Executive Officer, has been appointed by the Company's Board of Directors (the "Board") to serve as the Company's Interim President and Chief Executive Officer while the Company conducts a search for a successor.

The announcements further revealed that Defendant Anderson would not stand for reelection at the 2017 annual meeting, and that Defendant Buck would assume the role of non-executive chairman.

166.    The June 1, 2017 Form 8-K noted that Defendant Anderson would continue as a non-officer Special Advisor through July 1, 2019, and, conditioned on his continued employment  Defendant Anderson would "continue to be paid his current annualized salary of $820,000," continue to vest his existing equity awards, and would "remain

eligible to participate in the Company's Capital Accumulation Plan and the Company's other employee benefit plans, subject to plan terms." Further, upon signing a separation and release agreement on or about July 1, 2019, he would receive a severance payment of $1.1 million. As part of the arrangement, Defendant Anderson signed a non-disclosure provision.

167.    The June 1, 2017 press release quoted Defendant Buck as stating: "After careful consideration, Scott and the Board have mutually determined that now is the time for a new leader to guide Patterson going forward." This was the only rationale for the change articulated in either the press release or Form 8-K.

168.    Ultimately, the Company appointed Mark Walchirk as its new president and CEO on October 24, 2017, effective November 20, 2017.

## **Materially False and Misleading Statements Continue**

169.    On June 28, 2017, Patterson filed a report for the fiscal year and quarter ended April 29, 2017 on Form 10-K (the "2016-2017 10-K"), signed by Defendants Anderson, Gugino, Buck, Blanco, Feragen, Lin, Rudnick, Schrimsher, Vinney and Wiltz. The Company reported net income of approximately $171 million, net sales of $5.59 billion, and earnings from continuing operations of $1.79 per share for the year. Regarding competition, the 2016-2017 10-K stated, in relevant part:

> *We compete with other distributors*, as well as several manufacturers, of dental and animal health products, primarily *on the basis of price, breadth of product line, customer service and value-added products and services. To differentiate ourselves from our competition we deploy a strategy of premium customer service* with multiple value-added components, a highly

qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and fulfillment centers*, and competitive pricing*.

*In the U.S. and Canadian dental supply market, we compete against Henry Schein, Inc., Benco Dental Supply Company*, at least 15 full-service distributors that operate on a regional level, and hundreds of small local distributors.

(Emphasis added.)

170.    The 2016-2017 10-K also provided an outline of the Company's "Business Strategy," which did not include the Antitrust Misconduct.

171.    Attached to the 2016-2017 10-K were SOX certifications signed by Defendants Wiltz and Gugino, attesting to the accuracy of the 2016-2017 10-K.

172.    The statements in ¶¶ 169-171 were materially false and misleading because they made misleading statements that failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) as a result of the Antitrust Misconduct, the Company's revenue and earnings were fraudulently inflated; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, Patterson's public statements were materially false and misleading at all relevant times.

173.    On August 4, 2017, the Company filed the 2017 Proxy Statement. Defendants Buck, Blanco, Feragen, Lin, Rudnick, Schrimsher, Vinney and Wiltz solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act,

which contained material misstatements and omissions.[15]

174.    Regarding the Company's Code of Ethics and Corporate Governance Guidelines, the 2017 Proxy Statement asserted, in relevant part:

> Our company has adopted and published Principles of Business Conduct and Code of Ethics. Our Principles of Business Conduct and Code of Ethics satisfy the requirements of Item 406(b) of Regulation S-K and applicable NASDAQ Marketplace Rules. Our Principles of Business Conduct and Code of Ethics are available on our website at www.pattersoncompanies.com or in print upon written request to Patterson Companies, Inc., 1031 Mendota Heights Road, St. Paul, Minnesota 55120, Attention: Investor Relations. We intend to disclose any amendment to or waiver from a provision of our Principles of Business Conduct and Code of Ethics that requires disclosure on our website at www.pattersoncompanies.com.
>
> Our company also has adopted and published Corporate Governance Guidelines. Our Corporate Governance Guidelines address various governance topics, including the role of our Board of Directors, the composition of our Board and selection of directors, functioning of our Board and its committees, compensation of directors, and conduct and ethics standards for directors. Our Corporate Governance Guidelines are available on our website at www.pattersoncompanies.com or in print upon written request to Patterson Companies, Inc., 1031 Mendota Heights Road, St. Paul, MN 55120, Attention: Investor Relations.

175.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics and Corporate Governance Guidelines were not followed, as the Individual Defendants violated the Code of Ethics and Corporate

---

[15] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Governance Guidelines, including by engaging in the Antitrust Misconduct and allowing false and misleading statements to be issued to the investing public.

176.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's financial prospects were misrepresented as a result of the Antitrust Misconduct and false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

177.    Further, the 2017 Proxy Statement failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) as a result of the Antitrust Misconduct, the Company's revenue and earnings were fraudulently inflated; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, Patterson's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

178.    The Company issued a press release on August 24, 2017 announcing its financial results for the quarter ended July 29, 2017. Without reference to the departure of Defendant Anderson or the Antitrust Misconduct, Defendant Wiltz was quoted as stating that the Company's "performance in the 2018 first quarter reflects a period of significant transition."

179.    On February 12, 2018, the FTC filed the FTC Complaint against Patterson, Schein and Benco, alleging that, no later than July 2012, Patterson, Schein and Benco entered into an agreement to refuse to provide discounts or compete for GPOs no later than July 2012. The FTC sought injunctive relief.

180.    On this news, the price of Patterson shares fell over 5%, or $1.71 per share, from its closing price on the previous day, closing at $31.21 per share on February 13, 2018.

181.    Before markets opened on March 1, 2018, the Company issued a press release announcing its financial results for the quarter ended January 27, 2018. The press release revealed, *inter alia*, that adjusted earnings per share decreased 25.9% year-over-year, sales were down in each category in the Company's Dental segment, and the Company was revising its full year guidance downward for the second consecutive quarter. Defendant Walchirk was quoted as attributing the disappointing results on transitions in the business, including changes in the sales force.

182.    The press release also revealed that, effective that day, Defendant Gugino would be transitioning out of the role of CFO, despite the fact that the Company had not identified a replacement for her, and an interim CFO would be appointed. Defendant Gugino agreed to serve as a special advisor to Patterson until July 31, 2018.

183.    In a conference call with analysts and investors held on March 1, 2018, Defendant Walchirk stated:

> Overall, the main issue facing our business today is execution. In the Dental segment, our results reflect the various transitions we have underway in the business, namely changes in our sales organization, disruptions related to our ERP implementation and the transition to selling an expanded digital equipment portfolio. These factors all contributed to lower revenues and margin compression during the quarter.

184.    On this news, the price of Patterson shares fell nearly 24%, or $7.47 per share, from their closing price on the previous day, closing at $24.11 per share on March 1, 2018. As of the time of filing, shares had continued to trade in the range of approximately $21 to $26 since March 1, 2018.

185.    On April 12, 2018, the United States District Court for Eastern District of New York denied defendant's motion for summary judgment in the SourceOne Action on all claims other than SourceOne's state law claims for aiding-and-abetting. The Court concluded that:

> Based on the evidence presented, a jury could reasonably find that at some point between October 2013 and January 2014, defendants agreed with each other or with Schein to exclude SourceOne from the market, including by agreeing to boycott the conventions hosted by the Texas Dental Association and the Arizona Dental Association if those associations did not discontinue their relationship with SourceOne, and by pressuring individual manufacturers and at least one prominent dentist to also discontinue their relationship with SourceOne in furtherance of this conspiracy. SourceOne has shown both parallel conduct and evidence to support at least three "plus factors." Based on this evidence, a jury could reasonably infer collusion over ambiguous conduct.

SourceOne Order at 11-12.

186.    On April 20, 2018, the Texas Attorney General announced that, after a three-year investigation of Patterson, Schein and Benco, it had reached a $200,000 settlement with Patterson in connection with an illegal group boycott to eliminate an

online rival, the TDA GPO. As part of the settlement, the Company is required to undertake additional antitrust training and is prohibited from repeating an economically damaging practice. Settlements had previously been reached with Benco and Schein.

### Patterson Continues to Deny the Antitrust Misconduct

187.   As the truth surrounding the Antitrust Misconduct was emerging, the Individual Defendants cause the Company to make, and Defendant Walchirk himself made, false and misleading statements denying the Antitrust Misconduct.

188.   The Company issued a press release on February 13, 2018, denying the allegations in the FTC Complaint. The press release stated, in relevant part: "Patterson maintains the highest levels of integrity and ethical standards and has a 140 year history of partnering with all types of customers to grow their businesses and provide outstanding care to their clients."

189.   During the March 1, 2018 conference call, Defendant Walchirk addressed the FTC Complaint, stating, in relevant part:

> As we announced, ***Patterson believes the allegations are meritless and we intend to vigorously defend ourselves***. There are a few items we'd like to highlight regarding this matter. First, ***we operate in a market with an extremely competitive dynamic among peers and competitive prices***. Second, ***Patterson always has and always will act unilaterally and independently on all competitive matters***. And finally, we do not anticipate this matter will have a material adverse effect on our financial condition or results of operations. It's also important to note that the complaint seeks injunctive relief and does not seek monetary damages.

(Emphasis added.)

190.    In a conference call with analysts and investors held on June 21, 2018, Defendant Walchirk stated, in response to an analyst's question about the FTC Complaint:

> we're at this point expecting the FTC trial to commence in October, and that's part of the process that we've been well aware off. And as obviously, we've said and certainly would reiterate, **_we believe the allegations are without merit_** and we're fighting the situation vigorously. So, we don't anticipate this matter will have a material effect on our financial condition, and certainly we're working closely to work through the situation and again expect that the trial would commence in October.

(Emphasis added.)

191.    The statements in ¶¶ 188-190 were materially false and misleading because they made misleading statements that failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) as a result of the Antitrust Misconduct, the Company's revenue and earnings were fraudulently inflated; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, Patterson's public statements were materially false and misleading at all relevant times.

## **REPURCHASES**

192.    During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

193.    As the Company's stock was actually only worth $22.10 per share, the price at closing on March 22, 2018, the Company overpaid over $205.5 million in total for these repurchases.

194.    According to the Company's Form 10-Q filed with the SEC on December 10, 2015, in the quarter ended October 31, 2015, the Individual Defendants caused the Company to repurchase 3,873,324 shares of its own common stock at an average price per share of approximately $45.36 for a total cost to the Company of approximately $175.7 million.

195.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $23.26 more than the actual worth of each share during the quarter ended October 31, 2015. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended October 31, 2015 was approximately $90.1 million.

196.    According to the Company's Form 10-Q filed with the SEC on March 10, 2016, in the quarter ended January 30, 2016, the Individual Defendants caused the Company to repurchase 505,410 shares of its own common stock at an average price per share of approximately $47.95 for a total cost to the Company of over $24.2 million.

197.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $25.85 more than the actual worth of each share in the quarter

ended January 30, 2016. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended January 30, 2016 was approximately $13.1 million.

198.    According to the Company's Form 10-Q filed with the SEC on September 8, 2016, in the quarter ended July 30, 2016, the Individual Defendants caused the Company to repurchase 531,074 shares of its own common stock at an average price per share of approximately $47.07 for a total cost to the Company of approximately $25 million.

199.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $24.97 more than the actual worth of each share in the quarter ended July 30, 2016. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended July 30, 2016 was approximately $13.3 million.

200.    According to the Company's Form 10-Q filed with the SEC on December 7, 2016, in the quarter ended October 29, 2016, the Individual Defendants caused the Company to repurchase 543,541 shares of its own common stock at an average price per share of approximately $45.99 for a total cost to the Company of approximately $25 million.

201.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $23.89 more than the actual worth of each share in the quarter

ended October 29, 2016. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended October 29, 2016 was approximately $13 million.

202.    According to the Company's Form 10-Q filed with the SEC on March 8, 2017, in the quarter ended January 29, 2017, the Individual Defendants caused the Company to repurchase 911,603 shares of its own common stock at an average price per share of approximately $40.48 for a total cost to the Company of approximately $36.9 million.

203.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $18.38 more than the actual worth of each share in the quarter ended January 29, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended January 29, 2017 was approximately $16.8 million.

204.    According to the Company's Form 10-K filed with the SEC on June 8, 2017, in the quarter ended April 29, 2017, the Individual Defendants caused the Company to repurchase 868,991 shares of its own common stock at an average price per share of approximately $44.28 for a total cost to the Company of approximately $38.5 million.

205.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $22.18 more than the actual worth of each share in the quarter

ended April 29, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended April 29, 2017 was approximately $19.3 million.

206.    According to the Company's Form 10-Q filed with the SEC on September 9, 2017, in the quarter ended July 29, 2017, the Individual Defendants caused the Company to repurchase 823,082 shares of its own common stock at an average price per share of approximately $45.56 for a total cost to the Company of approximately $37.5 million.

207.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $23.46 more than the actual worth of each share in the quarter ended July 29, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended July 29, 2017 was approximately $19.3 million.

208.    According to the Company's Form 10-Q filed with the SEC on December 6, 2017, in the quarter ended October 28, 2017, the Individual Defendants caused the Company to repurchase 955,034 shares of its own common stock at an average price per share of approximately $38.22 for a total cost to the Company of approximately $36.5 million.

209.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $16.12 more than the actual worth of each share in the quarter ended October 28, 2017. Thus, the total over payment by the Company for repurchases of

its own stock during the quarter ended October 28, 2017 was approximately $15.4 million.

210.    According to the Company's Form 10-Q filed with the SEC on March 7, 2018, in the quarter ended January 27, 2018, the Individual Defendants caused the Company to repurchase 368,507 shares of its own common stock at an average price per share of approximately $36.63 for a total cost to the Company of approximately $13.5 million.

211.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $14.53 more than the actual worth of each share in the quarter ended January 27, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the quarter ended January 27, 2018 was nearly $5.4 million.

212.    In total, the Company overpaid an aggregate amount of nearly $205.5 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## EXCESSIVE COMPENSATION

213.    In breach of their fiduciary duties owed to Patterson, the Individual Defendants intentionally and/or recklessly wasted corporate assets on excessive severance payments of $1.8 million to Defendants Anderson and Gugino, as well as $820,000 per year paid to Defendant Anderson for his services as a non-officer special advisor though July 1, 2019. Given Defendant Anderson and Gugino's participation in

the misconduct as alleged herein, these amounts were excessive, unwarranted and not in the best interest of the Company.

## DAMAGES TO PATTERSON

214.    As a direct and proximate result of the Individual Defendants' conduct, Patterson is losing and expending, and will lose and expend, many millions of dollars.

215.    Such expenditures include, but are not limited to, legal fees and payments associated with the Antitrust Action, SourceOne Action, IQ Dental Supply Action, and the FTC Action filed against the Company, the Securities Class Action filed against the Company and two of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

216.    Such expenditures include, but are not limited to, legal fees, costs associated with the investigation, a $200,000 settlement, and costs of instituting an antitrust training program, and complying with other conditions incurred as a result of the investigation by the Texas Attorney General.

217.    Such losses include the Company's overpayment by approximately $205.5 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

218.    Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

219.     Such costs include, but are not limited to, unwarranted severance payments of nearly $1.8 million approved for Defendants Anderson and Gugino, and payments of $820,000 per year to Defendant Anderson for his services as a non-officer special advisor though July 1, 2019, despite those Defendants breaching their fiduciary duties by causing the Company to engage in the Antitrust Misconduct and issue false and misleading statements about the Antitrust Misconduct.

220.     Further, the Company was damaged by the false and misleading statements made in the 2017 Proxy Statement, as the 2017 Proxy Statement induced shareholders to reelect Defendants Buck, Blanco, Feragen, Lin, Rudnick, Schrimsher, Vinney and Wiltz to the Board, who then continued to harm the Company, giving rise to actionable Section 14(a) claims and breach of fiduciary duty claims.

221.     As a direct and proximate result of the Individual Defendants' conduct, Patterson has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## STATUTORY STANDARD OF CONDUCT

222.     Each of the Defendants who are or were Patterson directors failed to discharge his or her duties as a director of Patterson in good faith, in a manner he or she reasonably believed to be in the best interests of Patterson, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances, thereby

failing to adhere to the standard of conduct required of them pursuant to Minn. Stat. § 302A.251.

223.    Pursuant to Minn. Stat. § 302A.251, subd. 4, any provision in Patterson's articles of incorporation limiting director liability is ineffective with respect to the director Defendants' conduct alleged herein because such conduct was reckless and not in good faith, and constituted a breach of loyalty to Patterson and its shareholders.

224.    Pursuant to Minn. Stat. § 302A.361, the Defendants who are/were officers of Patterson were required to discharge their duties in good faith, in a manner they reasonably believed to be in the best interests of Patterson, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances -- which they failed to do.

## DERIVATIVE ALLEGATIONS

225.    Plaintiff brings this action derivatively and for the benefit of Patterson to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Patterson, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act as well as the aiding and abetting thereof.

226.    Patterson is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

227.    Plaintiff is, and has been continuously at all relevant times, a Patterson shareholder. Plaintiff will adequately and fairly represent the interests of Patterson in

enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

228.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

229.    A pre-suit demand on the Board of Patterson is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals, Individual Defendants Buck, Walchirk, Blanco, Feragen, Rudnick, Schrimsher, and Wiltz  (the "Director-Defendants") and non-parties Francis J. Malecha and Robert C. Frenzel (collectively, with the Director-Defendants, the "Directors"). Plaintiff only needs to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

230.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Antitrust Misconduct, to make and/or cause the Company to make the false and misleading statements and omissions of material fact while two of them engaged in insider sales based on material non-public information, netting proceeds of nearly $3.9 million, and, at the same time, to cause the Company to overpay $205.5 million for repurchases of its own stock, all of which renders the Director-Defendants unable to

impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

231.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused the Company to engage in the Antitrust Misconduct and made and/or caused the Company to make the materially false and misleading statements alleged herein. While investors were duped into believing the fraud perpetrated by the Individual Defendants, five of the Individual Defendants, two of whom are current Directors, collectively sold approximately $4.5 million worth of Company stock at artificially inflated prices based on inside material information and approved excessive severance payment to Defendants Anderson and Gugino.

232.    As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

233.    Additional reasons that demand on Defendant Walchirk is futile follow. Defendant Walchirk has served as the Company's CEO and as a Company Director since November 20, 2017. Patterson provides Defendant Walchirk with his principal occupation, and he receives handsome compensation, including a base salary of $850,000 and incentive compensation of up to $4.15 million per year. Thus, Defendant Walchirk a non-independent director. As the Company's highest officer and as a trusted Company director, Defendant Walchirk conducted little, if any, oversight of the Company's internal controls and of the scheme to engage in the Antitrust Misconduct and to make false and

misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Walchirk was ultimately responsible for the false and misleading statements and omissions that were made subsequent to November 20, 2017, including those he personally made in conference calls with analysts and investors. Further, Defendant Walchirk is no stranger to fraudulent wrongdoing in the sales organizations of companies he leads. During his tenure as President of U.S. Pharmaceutical at McKesson Corp., that company paid a $150 million-dollar settlement arising from its alleged failure to detect and report suspicious orders of prescription pain pills from pharmacies. He is also scheduled to be, or has been, deposed in connection with a lawsuit by the state of West Virginia surrounding the distribution of opioids. Thus, for these reasons, too, Defendant Walchirk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

234.    Additional reasons that demand on Defendant Wiltz is futile follow. Defendant Wiltz has served as a Company director since 2001, as the Company's interim CEO from June 2017 to November 2017, and as CEO from 2005 to 2010. He is a long-time Patterson employee, having worked for the Company since 1969. Thus, as the Company admits, Defendant Wiltz is a non-independent director. Defendant Wiltz receives handsome compensation, including $206,007 in the fiscal year ended April 29, 2017. As a long-time Company Director and CEO during part of the period of time in

which the wrongdoing alleged herein occurred, Defendant Wiltz conducted little, if any, oversight of the Company's internal controls and of the scheme to engage in the Antitrust Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Wiltz also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014-2015 10-K, 2015-2016 10-K and 2016-2017 10-K. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. His insider sales before the fraud was exposed, which yielded nearly $3.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Thus, for these reasons, too, Defendant Wiltz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

235.    Additional reasons that demand on Defendant Rudnick is futile follow. Defendant Rudnick has served as a Company director since 2003. Defendant Rudnick receives handsome compensation, including $231,007 in the fiscal year ended April 29, 2017. As a long-time Company Director, Defendant Rudnick conducted little, if any, oversight of the Company's internal controls and of the scheme to engage in the Antitrust Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Rudnick also

was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed the 2014-2015 10-K, 2015-2016 10-K and 2016-2017 10-K. She also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Her insider sales before the fraud was exposed, which yielded nearly $682,500 in proceeds, demonstrate her motive in facilitating and participating in the fraud. Thus, for these reasons, too, Defendant Rudnick breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

236. Additional reasons that demand on Defendant Blanco is futile follow. Defendant Blanco has served as a Company director since April 2017, and serves on the Audit Committee. He receives handsome compensation, in accordance with the Company's non-employee director compensation scheme. As a trusted Company Director and member of the Audit Committee, Defendant Blanco conducted little, if any, oversight of the Company's internal controls and of the scheme to engage in the Antitrust Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016-2017 10-K that is referenced herein. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Further, Defendant Blanco is the Executive Vice President and Chief Supply Chain officer of Ecolab Inc. ("Ecolab").

Patterson purchased approximately $15.0 million of products from Ecolab, and Ecolab purchased approximately $1.0 million of products from Patterson, during the Ecolab fiscal year that is most closely aligned with Patterson's fiscal year ended April 29, 2017. As a result of the sales relationships between Ecolab and Patterson, Defendant Blanco may fear retaliation against Ecolab or himself should he grant a demand, and thus, he is unable to evaluate a demand with independence. Thus, for these reasons, too, Defendant Blanco breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

237.   Additional reasons that demand on Defendant Buck is futile follow. Defendant Buck has served as a Company director since 2006, is the Chairman of the Board, and serves on the Audit Committee. Defendant Buck receives handsome compensation, including $256,007 in the fiscal year ended April 29, 2017. As Chairman of the Board and member of the Audit Committee, Defendant Buck conducted little, if any, oversight of the Company's internal controls and of the scheme to engage in the Antitrust Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Buck also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014-2015 10-K, 2015-2016 10-K and 2016-2017 10-K. Thus, for these reasons, too, Defendant Buck breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

238.   Additional reasons that demand on Defendant Feragen is futile follow. Defendant Feragen has served as a Company Director since 2011 and is the Chair of the Audit Committee. She receives handsome compensation, including $236,007 in the fiscal year ended April 29, 2017 As a trusted Company Director and Chair of the Audit Committee, Defendant Feragen conducted little, if any, oversight of the Company's internal controls and of the scheme to engage in the Antitrust Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, she signed, and thus personally made, the false and misleading statements in the 2014-2015 10-K, 2015-2016 10-K and 2016-2017 10-K that are referenced herein. She also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, too, Defendant Feragen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

239.   Additional reasons that demand on Defendant Schrimsher is futile follow. Defendant Schrimsher has served as a Company director since 2014. Defendant Schrimsher receives handsome compensation, including $216,007 in the fiscal year ended April 29, 2017. As a trusted Company Director, Defendant Schrimsher conducted little, if

any, oversight of the Company's internal controls and of the scheme to engage in the Antitrust Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Schrimsher also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014-2015 10-K, 2015-2016 10-K and 2016-2017 10-K. He also solicited the 2017 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, too, Defendant Schrimsher breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

240.    Additional reasons that demand on the Board is futile follow.

241.    As described above, two of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Wiltz and Rudnick collectively received proceeds of approximately $3.9 million as a result of insider transactions executed during the period of time when the Company's stock price was artificially inflated due to the Antitrust Misconduct and false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

242.    Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or

reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by $205.5 million for its own common stock during the period of time in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

243.   Demand in this case is excused because the Directors, seven of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

244.   All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability

and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

245.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

246.    Defendants Feragen, Buck, and Blanco (the "Audit Committee Defendants") served on the Company's Audit Committee. Pursuant to the Audit Committee Charter, Audit Committee Defendants were responsible for overseeing the Company's financial reporting processes and audits of the Company's financial statements, and taking the appropriate actions to set the overall corporate "tone" for quality financial reporting, sound business risk practices and ethical behavior. As a result of the Audit Committee's failures of management and oversight, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

247.   Patterson has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Patterson any part of the damages Patterson suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

248.   The Individual Defendants' conduct described herein and summarized above, including the decisions for the Company to engage in the repurchases of its own stock and for the Company to make the unwarranted severance payments of nearly $1.8 million for Defendants Anderson and Gugino, and payments of $820,000 per year to Defendant Anderson for his services as a non-officer special advisor though July 1, 2019, could not have been the product of legitimate business judgment as they were based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, such Directors are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

249.   The acts complained of herein constitute violations of fiduciary duties owed by Patterson's officers and directors, and these acts are incapable of ratification.

250.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Patterson. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Patterson, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

251.     If there is no directors' and officers' liability insurance, then the Directors will not cause Patterson to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

252.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of**
**Section 14(a) of the Securities Exchange Act of 1934**

253.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

255.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

256.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

257.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) as a result of the Antitrust Misconduct, the Company's revenue and earnings were fraudulently inflated; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, Patterson's public statements were materially false and misleading at all relevant times.

258.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

259.    Moreover, the 2017 Proxy Statement was false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Ethics and Corporate Governance Guidelines, due to the Individual Defendants' failure to abide by them and to their engagement in the Antitrust Misconduct and making and or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein.

260.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including election of directors and ratification of the appointment of an independent registered public accounting firm.

261.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Buck, Blanco, Feragen, Lin, Rudnick, Schrimsher, Vinney and Wiltz, which allowed them to continue breaching their fiduciary duties to Patterson.

262.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

263.    Plaintiff on behalf of Patterson has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

264.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Patterson. Not only is Patterson now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Patterson by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase hundreds of millions of dollars of its own shares at artificially-inflated prices, damaging Patterson.

266.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

267.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Patterson not misleading.

268.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Patterson. The Individual Defendants acted with

scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

269.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

270.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

271.    Plaintiff, on behalf of Patterson, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

272.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

273.    The Individual Defendants, by virtue of their positions with Patterson and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Patterson and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Patterson to engage in the illegal conduct and practices complained of herein.

274.    Plaintiff, on behalf of Patterson, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

275.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

276.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Patterson's business and affairs.

277.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

278.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Patterson.

279.    In breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in, the Antitrust Misconduct.

280.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

281.    In further breach of their fiduciary duties owed to Patterson, the Individual Defendants intentionally and/or recklessly wasted corporate assets on repurchases of the Company's own stock and excessive payments made to Defendants Anderson and Gugino and willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact. Specifically, Defendants failed to disclose that: (1) the Company engaged in the Antitrust Misconduct; (2) as a result of the Antitrust Misconduct, the Company's revenue and earnings were fraudulently inflated; (3) the Company failed to maintain internal controls; and (4) as a result of the foregoing, Patterson's public statements were materially false and misleading at all relevant times.

282.    The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

283.    In breach of their fiduciary duties, five of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the inflated revenues caused by the Antitrust Misconduct and due to the false and misleading statements of material fact that failed to disclose the

Antitrust Misconduct. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing its own stock.

284.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Patterson's securities and disguising insider sales.

285.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly.

286.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

287.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Patterson has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

288.     Plaintiff, on behalf of Patterson, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

289.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

290.     By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Patterson.

291.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Patterson that was tied to the performance or artificially inflated valuation of Patterson, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, including the unwarranted severance payments of nearly

$1.8 million for Defendants Anderson and Gugino, and payments of $820,000 per year to Defendant Anderson for his services as a non-officer special advisor though July 1, 2019.

292.   Plaintiff, as a shareholder and a representative of Patterson, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

293.   Plaintiff, on behalf of Patterson, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

294.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

295.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Patterson to waste valuable corporate assets and to incur many millions of dollars of legal liability and costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

296.   The Individual Defendants further wasted valuable corporate assets by granting unjust and unwarranted severance payments of nearly $1.8 million for

Defendants Anderson and Gugino, and payments of $820,000 per year to Defendant Anderson for his services as a non-officer special advisor though July 1, 2019.

297. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

298. Plaintiff, on behalf of Patterson, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all of the Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Patterson, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Patterson;

(c)    Determining and awarding to Patterson the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Patterson and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Patterson and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper

corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of Patterson to nominate at least five candidates for election to the board;

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

      (e) Awarding Patterson restitution from Individual Defendants, and each of them;

      (f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

      Plaintiff hereby demands a trial by jury.

Dated: October 1, 2018

      Respectfully submitted,

      CZUCHRY LAW FIRM, LLC

      By: /s/ Mark E. Czuchry
      Mark E. Czuchry
      Attorney Lic. No. 293672
      Clock Tower Building
      1750 Tower Blvd., Ste. 209

P.O. Box 73
Victoria, Minnesota 55386
Telephone: (952) 443-4004
Facsimile: (952) 443-4004
Email: Mark@MecLawFirm.com
*Attorney for Plaintiff*

Of Counsel, Pro Hoc Vice Applications to
be submitted, are the following:

Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegla.com

Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
*Of Counsel for Plaintiff*

DocuSign Envelope ID: 4EF0A21D-FB29-4AEB-BE38-8F40D6897C4B

## VERIFICATION

I, Sally Pemberton   am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of July 2018.

7/27/2018 11:40:33 AM PDT

DocuSigned by:

*Sally Pemberton*

C2ACBB7EE4F3...Sally Pemberton